BENTLEY ET AL. vs. CLEAVELAND.

1. A defendant may protect himself from a discovery and account, by a partial answer averring that complainants are slaves.
2. When such a partial answer is filed, it is not error to reserve to the complainants the right to except to it for want of the discovery, if it should be found on the hearing of the answer that they are entitled to it.
3. But the Chancellor has no power to order the answer to stand for a plea, and to be tried as such.
4. If, however, the answer is ordered to stand for a plea, and an issue is made on it as such, under which complainants proceed to take proof to establish their right to be heard, and to the relief sought by their bill, the irregularity only amounts to error without injury.
5. If the allegations of the answer are sufficient as to the slavery of those complainants who are the only real parties in interest, exceptions will not lie to it for the insufficiency of its allegations as to the slavery of the other complainants who are merely formal parties.
6. Mutuality is an essential ingredient in all estoppels; and as a slave can neither be bound by a covenant, nor hindered by an estoppel, the law will not allow him to claim the benefit of an estoppel against another.

ERROR to the Chancery Court of Mobile.
Heard before the HON. J. W. LESESNE.

The complainants, Warren Bentley and Cecilia, his wife, and Lewis Young, a minor, who sues by Edward Parker, his next friend, set out in their bill that said Cecilia and Lewis are the only heirs at law and distributees of the estate of Lewis Young, deceased, a free man of color, who was a resident of the city of Mobile, and who died intestate in the year 1834.

It is alleged in the bill, that the intestate died seized of a lot of land in said city, with several tenements erected upon it, and possessed of two slaves, a woman about forty years of age, and a man about fifty years old, together with sundry notes and accounts of value, and two soldiers' land warrants, each for one hundred and sixty acres of land in the State of Arkansas; that the complainants, Cecilia and Lewis, were too young at the time of the death of Lewis Young, their father, to know much of his property, or of what it consisted, and can only state generally in what it did consist, and this, prin-

cipally on information derived from friends who are better acquainted with their father's affairs than they are themselves. It is further alleged, that one William F. Cleaveland was the friend of Lewis Young, the elder, while he lived, frequently advising him in matters of business, and at his death said Cleaveland took charge of his estate, both real and personal, and the management of the complainants, Cecilia and Lewis, but never sued out letters of administration or guardianship; that in the course of time, since the death of Lewis Young, he has received large sums of money for said rent, and slave hire belonging to the estate, to which the complainants are entitled, but for which said Cleaveland refuses to account with them, although requested to do so.

The bill makes Cleaveland defendant, and prays a discovery of all assets which came to his hands belonging to the estate of said Lewis Young, deceased, and that he be decreed to deliver to the complainants the muniments of title to the real estate, and to pay over to them all moneys which he has received from land rent, negro hire, or any other source, which belong to said estate of Lewis Young, deceased.

On this bill subpœna issued; personal service was effected, and the defendant having failed to answer within thirty days from such service, a decree *pro confesso* was regularly entered against him on the 25th day of November, 1850.

Without any order setting the decree *pro confesso* aside, the defendant filed his answer on the 21st January, 1851. On the same day, (although it is dated in this part of the record as 21st January, 1850,) the complainants' solicitor filed exceptions to the answer for insufficiency in failing to make a full discovery on the matters set forth in the bill, and on which a discovery was sought; but the record no where shows that any exception was taken to its being filed while the decree *pro confesso* remained in force.

The answer sets up matter in bar to the persons of the complainants, averring that those who are set out as the children of Lewis Young, deceased, are slaves, denying that the complainant Bentley is free, and averring that he is of full African descent. It denies that the defendant is executor *de son tort* of Lewis Young, deceased, but avers that he was regularly appointed administrator, and exhibits his letters of

administration, but makes no particular discovery of the assets which came to his hands, setting up that the complainants have no right to sue in this State, are incapable of holding property, and cannot take by inheritance.

To this answer exceptions were filed, and overruled; and the Chancellor ordered the answer to stand for a plea, and the case to be heard on the issue thus made, reserving to complainants the privilege of excepting to the answer for insufficiency, in the event the issue on the plea should be found in their favor.

The parties proceeded to take proof on the issue made by the plea; when the evidence very clearly established that the mother of Bentley's wife, and of the infant defendant Young, was a slave, the property, first, of Dr. Gannard, and then, by purchase from him, of Lewis Young, deceased, the father of the complainants Cecilia and Lewis, and she was never manumitted by her husband according to the laws of this State.

The Chancellor dismissed the bill, at the cost of the adult complainants and the next friend of the infant.

From this decree the complainants prosecute a writ of error to this court, and assign for error:

1. The order disallowing their exceptions to the answer;

2. The order refusing an attachment which they asked for to compel a full answer, after the answer in the record had been filed, and exceptions to it disallowed;

3. Disallowing their exceptions taken to the answer as a plea;

4. The final decree dismissing the bill.

J. F. ADAMS, for plaintiffs in error.

JOHN A. CAMPBELL, contra.

LIGON, J.—The exceptions taken to the answer for want of the discovery sought by the bill, upon first inspection of the record, will appear strikingly well taken; and when they are viewed only in reference to the state of the pleadings when the answer was filed, and our own statute prescribing the character of such an answer as is required in order to set aside a decree pro confesso, it is difficult to perceive a good reason for overruling or disallowing them. The statute

(Clay's Dig. 251, § 39,) provides, that no decree *pro confesso* shall be set aside, but on filing a full and complete answer to the bill. And this should, doubtless, generally extend to all parts of the bill. In a case thus situated, no plea or demurrer can be allowed. The rule was evidently intended to hasten a fair trial on the facts or merits of the case, regardless of those irregularities or defects in pleading, which, at an earlier stage of the proceedings, might have been fatal on demurrer, or, at least, might have caused an amendment, and thus brought about delay.

A case thus situated occupies the same place in our practice, which an English case does in theirs when a defendant has waived his right to plead or demur, and submits to file an answer. The books say, that such a defendant must answer "fully." It is evident that the word "complete" in our rule, gives no strength to the sentence, nor does it enlarge the meaning. A "full" answer, is as extensive a term in describing one which is ample and sufficient, as though the term "complete" had been superadded. The latter is mere tautology.

But the English courts never understood this rule to be so inexorable, as to compel them to bow before it, at the hazard of being driven to injustice; and long before the adoption of the New Orders in 1841, which expressly modified its rigour, a practice, which has now the force of a rule, of allowing partial answers, grew up among them. These answers were mainly intended to avoid discovery in such cases as it could well be excused, by showing the court that the complainant did not fill the character which he claimed for himself in the bill, and was therefore not entitled either to the relief or the discovery he sought. 2 Dan. Ch. Prac. and Plead. 821-2; Wigram on Discovery 90, 152.

This was evidently a departure from the letter of the rule, but none from its spirit, or from the spirit and intention of all chancery rules. These are mainly intended to fence out injustice and oppression from that court, so that equity, unmixed by fraud, oppression or injustice, may, with unchecked hand, be dealt out to all its suitors. When our chancery rules were arranged and adopted in 1842, this modification had long existed in England as one of the rules of

their practice; and as it is not repugnant to our own rules, laws or institutions, it became incorporated as one of our rules by the adoption of the last rule of our practice. Clay's Dig. 618, Rule 51. The same practice prevails in many of the States which have adopted the English rule with respect to answers, when the defendant submits to file one. Hunt v. Gookin, 6 Ver. 462; Cuyler v. Bogert, 6 Paige 186; Methodist Episcopal Church v. Jaques et al., 1 Johns. Chancery Rep. 65.

The case under consideration falls legitimately within that class on account of which the rule was modified. If the matter of the answer be true, there is an end of the case. It alleges, that Cecilia Bentley and Lewis Young are slaves. These plaintiffs are the only parties who really assert an interest in the property in controversy; and were it not for the coverture of the one, and the infancy of the other, there would be no need of any other party whatever.

A slave can have no standing in a court of chancery in this State. He cannot hold property, and consequently cannot litigate the title to it. He is not subject to be sued, nor can any civil judgment or decree be rendered against or for him. His person, his labor, and his earnings belong to his master, and are held or enjoyed by the slave only by permission of the master, and for him should he ever think proper to claim it. A being thus situated, cannot sue; and the fact that the plaintiffs are not free negroes, as they pretend to be, but slaves, may well form the matter of a partial answer, showing sufficient reason why no fuller answer containing the discovery sought should be filed.

If this power did not exist, there would arise a long and appalling list of oppressions, resulting from fraud or malice on one part, and carelessness or weakness on the other; and as they arise, the court would be without the power to protect its jurisdiction, or shield its suitors. In this case, if the matter of the partial answer be true, the plaintiffs come here under a false title, claiming to be free persons, when in fact they are slaves, and by this suppression of their status, they seek to litigate in this court in fraud of its jurisdiction.

Under these views of the power of the Chancellor over the rules of practice and pleading in his court, there was mani-

festly no error in disallowing the exceptions to the answer, until the question of the plaintiffs' right to proceed at all could be first passed upon by the court. Nor do we think there was any error in reserving to the complainants the right to except for want of the discovery, if, on the hearing of the answer already in, it should be found they were entitled to it; for, if the answer of the defendant should turn out to be false, he would be allowed to derive no advantage from it. But we cannot well see whence the court derived its authority to direct the answer to stand for a plea, and to be tried as such. The rules of practice fully justify its being received and treated as an answer, and we are not aware of any rule which allows an answer to be taken for a plea, although, under some circumstances, a plea has been ordered to stand and be heard as an answer. 2 Danl. Prac. and Pl. 800 and 801; Mit. Pl. 303–4; Story's Eq. Pl. 699. Nor do we think, under our practice, a defendant, after decree *pro confesso*, has a right to put in any defence by way of plea, any more than under the English practice he would have the right to do so after answer. Under both systems, it would be an anomaly to find a plea allowed at this stage of the proceedings. But it is fully in the power of the Chancellor to receive a partial answer, if the matter brought to his view by it shows that the character in which the plaintiff appears by his bill is a false one, and that, in fact, he has no right to call on the defendant to make the discovery he seeks. And it will always be allowed, when it is apparent that, if the answer be true, the plaintiff would not be allowed to proceed, and the cause must terminate.

We think, therefore, it would have been more regular, and consistent with the rules of practice, to have heard this case on the answer as such, and not to have ordered it to stand for a plea. But inasmuch as the complainants have been allowed a full opportunity to test the truth of the answer, and to take proof to establish their right to be heard, and to the relief they seek, under the issue made on the answer as a plea, and as they did go on to take some proof, it is apparent that they have sustained no injury from the form in which the issue was tried in the court below; and as the irregularity only amounts to error without injury, no reversal can result from it.

2. After what has been said in relation to the first assign-

ment of error, it is scarcely necessary to add that there was
no error in refusing the motion for an attachment to compel
an answer. The court had already overruled exceptions to
the answer on file, and in this we have seen there was no error.
There being a sufficient answer on file, no attachment or other
process could go to compel another. The Chancellor had, in
overruling the plaintiffs' exceptions to the answer, reserved
to them the privilege of renewing them, in the event it
should be found they were free persons of color; but until
that issue was tried, the rest of the case should stand still,
especially as this preliminary issue might involve the fate of
the suit.

3. The third assignment of error relates to the ruling of
the court in disallowing the plaintiffs' exceptions to the an-
swer, when it was ordered to stand for a plea. These excep-
tions were taken, because it is said that the slavery of the
three colored plaintiffs is not alleged with sufficient certainty.
The allegations in respect to the slavery of Cecilia Bentley and
Lewis Young are clear and unequivocal. These are the only
persons in whose behalf any equity arises against the defend-
ant. Without the wife, Cecilia Bentley, and the infant, Lewis
Young, the husband and next friend would have no standing
whatever in this court. The suit of the husband and wife,
in respect to the separate estate of the latter, is essentially the
suit of the wife. She has the entire interest in the corpus of
the estate, and the decree must be for her use. Michan and
Wife v. Wyatt, 21 Ala. 813. It matters nothing, therefore,
whether the answer is sufficiently certain as to the slavery of
Warren Bentley, the husband; if his wife is a slave, he can
take nothing through her; and if the minor Lewis Young be
such, his next friend must fail.

4. The only remaining question arising on the assignment
of errors, relates to the decree dismissing the bill, on the issues
tendered by the answer on file. The proof is clear and un-
contradicted, that the mother of Cecilia and Lewis Young
was, at the time of their respective births, a slave, and the
record shows no act of manumission as to them. Their con-
dition must follow that of their mother at the time of their
birth, and it cannot be changed but by an act of the owner.
That which the law requires to be done, in order to invest

them with freedom, is not proved to have been performed; so that, from all that appears, they are still slaves. Under these circumstances, they are forbidden, by the policy of our law, from receiving property by inheritance, or taking and holding it in this State by deed, bequest or devise. Atwood's Heirs v. Beck, Adm'r., 21 Ala. 590; Trotter v. Blocker and Wife, 6 Porter 292. Nor can they sue to enforce a claim to property. Since these children cannot do so, neither can the husband of the one or the next friend of the other, as they only represent the interest of the wife and minor, whose suit this really is, and who, we have seen, cannot be heard in a court of chancery in their present condition.

But it is contended, that, although these plaintiffs may be disqualified from suing generally, yet circumstances exist between the defendant and themselves, which hinder him from setting up their disqualification. In other words, that by his own acts Cleaveland is estopped from denying their right to sue. It is shown, by his answer, that he has received deeds for real estate made to him as trustee for these children; and it is further admitted that the possession of these lots has been recovered from him in actions at law, by those who represented the interest of Cecilia and Lewis Young, without any defence on his part. The defendant, however, insists in his answer that he instructed his counsel in the action at law to defend them, but that he was misunderstood, and thus judgment by default was taken against him.

Be this, however, as it may, it cannot work an estoppel in favor of these plaintiffs. Mutuality is an essential ingredient in all estoppels; and as these plaintiffs, being slaves, are not answerable civilly, as they are subject to no suit, as no civil libability ever attaches to them, and they can be neither bound by a covenant, nor hindered by an estoppel, the law will not allow them to claim that of another which he could not set up against them, or, rather, which he could not set up against their owners, who are entitled to whatever property the slave acquires.

It results from what has been said, that the decree dismissing the bill must be affirmed, at the costs of Warren Bentley and Edward Parker, both in this court and the court below.